621 So.2d 539 (1993)
Matthew KESSLER, Appellant,
v.
COMMUNITY BLOOD BANK and Michigan Millers, Appellees.
No. 92-1592.
District Court of Appeal of Florida, First District.
July 13, 1993.
*540 Joseph H. Saunders, of Fernandez & Saunders, P.A., Pinellas Park, for appellant.
Nancy A. Blastic, of O'Riorden, Mann, Hootman, Ingram & Dunkle, P.A., Sarasota, for appellees.
MICKLE, Judge.
Claimant, Matthew Kessler, appeals from an order of the Judge of Compensation Claims ("JCC") denying his claim for benefits. We reverse and remand for further proceedings.
The claim arose from an injury sustained by Claimant on March 19, 1990, while working at the Community Blood Bank in Pinellas County drawing blood from, and attending to, donors. He received initial treatment from a chiropractor, Dr. Paulantonio, and reported a history of the March 19 accident that resulted from lifting a fallen blood donor from the stairwell of the "bloodmobile." Claimant complained of sharp pains in the back and neck, some leg pains, and difficulty in breathing. After missing a few days of work, Claimant returned to full-time, light-duty work subject to restrictions on lifting and bending. Dr. Paulantonio performed a clinical examination and ordered an MRI scan, which was performed on April 3, 1990. Having opined that Claimant had sustained post-traumatic headaches and traumatic sprains to the cervical and dorsal lumbar spine, the doctor commenced treatment with chiropractic manipulations.
A disability slip dated June 6, 1990 indicates that Claimant was totally incapacitated, and Dr. Paulantonio completed subsequent slips indicating Claimant's status was unchanged. The doctor explained that as of June 6, when Claimant complained of acute back pain, it was necessary to take him out of work totally due to an "exacerbation of symptoms." However, the record shows that the doctor did not perform a physical examination on June 6. Furthermore, he was unaware that Claimant had been fired from his job as a phlebotomist on the previous day, as the result of three separate reported acts of insubordination.
Claimant received additional treatment from an orthopedic surgeon, Dr. Sullivan, who determined from a physical examination that Claimant had no neurological deficits. X-rays showed some developmental changes but no traumatic or acute changes in the back. The doctor testified that it is abnormal for someone of Claimant's age (24 years) to have so many changes in the back as were indicated in the MRI report. Sullivan opined that Claimant's complaints and the results of the MRI and clinical examination are consistent with soft tissue problems in the back. The doctor found that Claimant had not reached maximum medical improvement ("MMI") when examined in May 1990. Sullivan testified that he had advised against continuing chiropractic treatment and instead had recommended physical therapy and certain exercises and instruction relating to care of the back. Claimant failed to return for a June 1990 appointment or to seek subsequent care from Dr. Sullivan.
About a month after the job termination, Claimant moved to Dade County and requested a chiropractor and an orthopedic surgeon. The Employer/Carrier ("E/C") inadvertently authorized a chiropractor who had retired, but Claimant was evaluated by the doctor's successor in the practice, *541 Dr. Lehman, in September 1990. Claimant submitted to orthopedic, neurological and chiropractic tests that "indicated disc involvement of the lower lumbar spine."
The E/C authorized Dr. Hinds, an orthopedic surgeon, to treat Claimant on October 26, 1990. Claimant testified that after a staff member took 4-6 x-rays, Dr. Hinds saw him. The remainder of the medical visit was described as follows:
He says, could you stand up. I had stood up. He said, can you bend over and I said no. He tried to push my back and I said that's as far as I can go. But he had lifted up my leg a couple of times and then he left the room. The examination wasn't longer than three minutes.
* * * * * *
My wife had came [sic] in, she sat down, all of a sudden Dr. Hinds comes back in with this sarcastic smile on his face and he says I have some good news and I have some bad news for you. He says the good news, there's nothing wrong with you. Never told me what the bad news was. He says well, I'll just call the insurance company, tell them there's nothing wrong with you. And then he said your paper's on the front desk, you can go. That was it.
Dr. Hinds was not deposed, nor did he testify. In a 2 1/2 page report in the record dated "October 26, 1989" but actually prepared on that date in 1990, Dr. Hinds commented:
Mr. Kessler is now seven months post soft tissue injury to the lower back. His findings, at this time, are definitely not consistent with a herniated disc clinically. He demonstrates on this visit somewhat of a passive aggressive tendency, as well as overt hostility toward his other treating physicians as well as the insurance carrier. Based on my findings, I find no reason he cannot return to normal employment as a phlebotomist. At seven months post injury, I doubt seriously if he would benefit at this time from further orthopedic treatment. He is MMI with no residual permanent disability as a result of the injury of March 19, 1990.
Dr. Lehrman, an orthopedic surgeon, provided unauthorized treatment on November 5, 1990, ten days after the visit to Dr. Hinds. Lehrman interpreted the MRI report as showing degenerative changes with dorsal herniation at L4-L5 and some degenerative changes at L5-S1. In a December 4, 1990, letter to the Carrier, he noted "Diagnosis: Herniated disk," and felt that Claimant would benefit from "an intensive rehabilitation and mobilization program." In a letter to another carrier the previous week, Dr. Lehrman had noted "Diagnosis: Disk syndrome, rule out herniated disk," and had recommended the same type of follow-up program. At the time of treatment, Lehrman did not think Claimant could work an eight-hour day, even if permitted to alternate periods of standing, sitting, and moving around, but he felt Claimant would be able to perform regular work after completing the recommended program. Dr. Lehrman testified that Claimant "was suffering from the residuals of a herniated disc."
Claimant received temporary total disability benefits for the period from his job termination to the date when Dr. Hinds determined MMI. The E/C defended the claim, asserting that Claimant had reached MMI on October 26, 1990, with no permanent impairment. On appeal, Claimant asserts three valid grounds for reversal.
First, the record lacks competent substantial evidence to support the finding of "no residual permanent impairment." Having carefully reviewed the record, including the doctors' depositions and medical reports and the JCC's order, and having considered the live testimony presented at hearing, we are convinced that Dr. Hinds' report is the key evidentiary source on which the JCC relied to find a date of MMI and an absence of permanent impairment. However, the JCC erred in accepting as pivotal Dr. Hinds' finding of "no residual permanent disability," and concluding from Hinds' report that Claimant has "no residual permanent impairment." Photo Electronics Corp. v. Glick, 398 So.2d 900, 901 (Fla. 1st DCA 1981). Dr. Hinds' report does not comply with section 440.15(3)(a)(3), *542 Florida Statutes (1989), which deals with impairment benefits and requires a permanent impairment rating pursuant to a schedule "based on generally accepted medical standards" such as the American Medical Association Guidelines. As we noted in Photo Electronics, a medical doctor "is qualified to testify only as to anatomic or functional impairment" within the doctor's medical expertise, whereas a JCC's function is to consider that testimony and, along with any evidence of loss of wageearning capacity, translate it into a disability rating. In Photo Electronics, we held that a treating physician's opinion about a claimant's disability constituted testimony "beyond his competence as a medical expert." Id. (Emph. added.) The E/C's argument notwithstanding, the difference between "disability" and "impairment" in this particular statutory context is not mere semantics, nor does the intermingling of the terms constitute mere harmless error. Because the record fails to support the JCC's determination on the impairment issue, we are compelled to reverse and remand for further proceedings. Collazo v. Sourini Painting Co., 516 So.2d 288 (Fla. 1st DCA 1987).
Second, Claimant challenges the JCC's resolution of the conflicting medical evidence. Undisputedly, the JCC has the discretion to assess credibility, resolve conflicts in the evidence, and accept the testimony of one doctor over that of others. H & A Frank's Constr., Inc. v. Mendoza, 582 So.2d 780 (Fla. 1st DCA 1991); Jefferson Stores, Inc. v. Rosenfeld, 386 So.2d 865 (Fla. 1st DCA 1980). The JCC specifically rejected the opinion of Dr. Paulantonio, who was the only doctor to indicate Claimant had been temporarily totally disabled. The JCC accepted the opinion of Dr. Hinds, discussed supra, regarding MMI and "disability." Dr. Hinds' findings were deemed to be consistent with Dr. Sullivan's diagnosis of a soft tissue injury. We decline to speculate as to what will be introduced into the record upon remand. Regarding the instant record on review, however, we note that the JCC failed to address the clear conflict between the opinions of Drs. Lehrman and Hinds concerning Claimant's condition, or to explain the reason for accepting the testimony of one orthopedic surgeon over another where the explanation is not apparent from the record. See H & A Frank's Constr., 582 So.2d at 780, 781; South v. Heartland Employment & Training Admin., 527 So.2d 270, 272 (Fla. 1st DCA 1988).
Third, the JCC determined that the E/C had authorized "qualified medical treatment." Section 440.13(2)(a), Florida Statutes (1989), requires an employer to furnish medically necessary treatment and care to an employee. Pursuant to subsection (2)(b), if an employer does not provide such treatment and care after a request by an injured employee, "the employee may do so at the expense of the employer, the reasonableness and necessity to be approved" by the JCC. The E/C denied Claimant's request for chiropractic care without fulfilling the requirements of section 440.13(2) and Bennett v. H & L Builders, Inc., 567 So.2d 33 (Fla. 1st DCA 1990). See Teimer v. Pixie Playmates, 532 So.2d 37 (Fla. 1st DCA 1988), rev. den., 539 So.2d 475 (Fla. 1989). An orthopedic surgeon was authorized at Claimant's request, but we note that Claimant lived in Miami Beach and had to make a 25-mile trip across the county to Hialeah to reach Dr. Hinds' office. Claimant testified that his painful back condition and inability to drive himself made the one-hour trip to Hialeah an unreasonable burden. See Commercial Carrier Corp. v. Fox, 400 So.2d 154 (Fla. 1st DCA 1981).
Claimant argues that the JCC reversibly erred in holding simply that "qualified medical treatment" was provided, without making a specific finding as to the reasonableness and necessity of the claim for further medical treatment. We agree. On remand, the JCC is to make appropriate findings in accordance with the statutory language and requirements and applicable decisional law.
Our holding does not require us to dispose of a fourth and final issue, which involves the unsuccessful claim for temporary partial disability benefits from the *543 date the E/C claimed MMI up to the date of hearing. See section 440.15(4), Florida Statutes (1989). However, in the interest of pointing out certain evidence that the JCC apparently overlooked regarding Claimant's post-termination job search, see Eastside Bait & Tackle v. Humphrey, 440 So.2d 41, 42 (Fla. 1st DCA 1983), we address Paragraph 14 of the order appealed, in which the JCC stated:
I find that there is no evidence the claimant has or has not conducted a good faith job search during the period of time in question as no Temporary Partial/Wage Loss Forms were submitted to the Employer/Carrier.
Claimant submitted claims for temporary partial benefits from the date of MMI. The adequacy of a job search is a factual question for the JCC to determine. Meek v. Layne-Western Co., 566 So.2d 31, 33 (Fla. 1st DCA 1990). The E/C acknowledge that Claimant testified he had conducted job searches in Pinellas and Dade Counties. The record includes a "job contact log" purporting to list names and addresses of employers contacted in the St. Petersburg area and stating the outcome of his search for employment. Without citing to any portion of the record, the E/C argue they "contested" Claimant's testimony about the job search. Our review of the questioning of Claimant at hearing, however, discloses that counsel for the E/C simply followed up Claimant's responses with additional questions to solicit details such as names and locations of prospective employers and their hiring directors. We decline to consider the E/C's argument based on section 440.15(4)(b), which refers to a loss of wages that results from an employee's "own misconduct." Irrespective of the outcome of this issue on remand, we note there is some relevant evidence in the record that the JCC apparently overlooked.
The order denying benefits is REVERSED and REMANDED for further proceedings.
ZEHMER and BARFIELD, JJ., concur.